UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SITNET LLC,

Plaintiff,

-against-

META PLATFORMS, INC.,

Defendant.

23-cv-6389 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Plaintiff SitNet has sued Defendant Meta for patent infringement. The patents in suit are Patent Nos. 9,877,345; 8,332,454; and 8,249,932. The Court held a *Markman* hearing on July 1, 2024. This opinion resolves the parties' motions for claim construction. *See* Dkts. 49, 50.

## LEGAL STANDARDS

Claim terms are generally given "their ordinary and customary meaning," which is the "meaning that [they] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).[1] Sometimes, the ordinary meaning is clear, and the term needs no construction. But "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (citation omitted). So "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* (citation omitted).

To pin down a term's ordinary meaning, the "analysis must begin and remain centered on the claim language itself." *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (cleaned up). The Court also considers "the intrinsic evidence, which includes the claims, written description [(specification)], and prosecution history." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). And though the specification "is often the single best guide to the meaning of a disputed term," *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021) (internal quotation marks omitted), the Court must "avoid the danger of reading limitations from the specification into the claim," *Phillips*, 415 F.3d

---

[1] "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022) (citation omitted). Neither exception is relevant here.

at 1323. Only if the term's meaning is still unclear after considering all the intrinsic evidence may the Court then consider extrinsic evidence. *See Seabed*, 8 F.4th at 1287.

## DISCUSSION

### I. A situational network

The parties dispute the meaning of "a situational network," which appears in claims 1 and 13 of the '345 patent, claim 1 of the '454 patent, and claims 1 and 22 of the '932 patent.

| SitNet's Construction | Meta's Construction | Court's Construction |
|---|---|---|
| a network that is a subset of a larger network, comprising member nodes, formed in response to an event or situation | a network created when an occurrence or expected occurrence of an event or situation causes connections to be established between, within or among a set of participants | a network created in response to an event or situation |

The main dispute here is whether "a situational network" is necessarily a subset of a larger network. SitNet says yes, and by "larger network," SitNet means a preexisting "online social network." Dkt. 57 at 6. The Court rejects SitNet's construction. To start, the claim term itself doesn't suggest nesting; a situational network sounds like a network based on a situation. And the intrinsic evidence confirms that understanding. Meta's proposed construction specifically tracks this line in the specifications: "Referring generally to FIG. 1, a situational network **3000** is created when an occurrence or expected occurrence of an event or situation **3005** causes connections, also referred to as links, to be established between, within or among a set of participants **250, 207**." '345 Patent Spec. 4:3–7; *accord* '454 Patent Spec. 3:60–64; '932 Patent Spec. 3:46–50. Here is the relevant part of the referenced figure:



'345 Patent at 4.

SitNet argues that the next line of the specifications clarifies that the situational network must be part of a larger social network. That line reads: "The situational network allows the participants **250**, **207** to interact and exchange information over connections to or through a computer network **900** regarding the event or situation[.]" '345 Patent Spec. 4:7–10; *accord* '454 Patent Spec. 3:64–67; '932 Patent Spec. 3:50–53. SitNet says the "computer network" is the larger social network. *See* Dkt. 57 at 10.

Not so. The phrase "connections to or through a computer network" makes clear that the computer network is simply the medium of connection; it is not a social network. That reading is confirmed by at least three parts of the specifications. First, the very next line in the specifications says the situational network may be the first time any of the users are part of the same network: "Some or all of the participants included in the situational network … may have no prior knowledge of or connection or contact with each other or other participants of the situational network through any other type of social network or personal interactions." '345 Patent Spec. 4:10–15; *accord* '454 Patent Spec. 3:67–4:5; '932 Patent Spec. 3:53–58.

Second, the specifications say that "[t]he computer network **900** may be implemented" using "Ethernet" or "wireless" "networking technologies, either separately or in combination." '345 Patent Spec. 14:1–5; *accord* '454 Patent Spec. 13:45–49; '932 Patent Spec. 13:28–32. It may also be implemented "using the well-known TCP/IP suite of protocols. The Internet and some corporate intranets are examples of computer networks that use the technologies and standards described above." '345 Patent Spec. 14:8–11; *accord* '454 Patent Spec. 13:52–55; '932 Patent Spec. 13:35–38. And users connect to the situational network using any devices "that enable connection to, from and through the computer network." '345 Patent Spec. 4:39–40; *accord* '454 Patent Spec. 4:29–30; '932 Patent Spec. 4:15–16.

Third, the figure above shows that the situational network (item 3000) contains the computer network (item 900), not the other way around. All this points to the "computer network" being just that, and not a social network.

Finally, SitNet points to a few other lines in the specifications for this "larger network" argument. But the Court struggles to see how they support SitNet's position. If anything, these lines suggest an alternative: they say users could be identified by their geographic location and that users could be added or removed from the situational network as the users or the situation move. *See* Dkt. 57 at 11–12. This seems to describe how to build a situational network independent of any preexisting network. And other parts of the specifications confirm that there is more than one way to skin a situational network; building it within a social network is just one embodiment. *See, e.g.*, '345 Patent Spec. 6:41–59; 7:52–54, 20:20–21.

Separate from the "larger network" dispute, SitNet also construes "situational network" to require "member nodes." Yet the one line that SitNet cites for this argument uses the term "event nodes." Dkt. 57 at 7. Indeed, the Court can't find the term "member nodes" anywhere in the patents (nor could SitNet, when asked at the hearing, Tr. 10:8–11). And the specifications say a situational network, in at least one embodiment, "can be formed in the absence of an event node." '345 Patent

Spec. 8:10–11; *see also id.* 5:65–67. Indeed, it seems that event nodes are required only when the situational network is formed within a larger social network. *See, e.g.,* '345 Patent Spec. 20:20–24. Having rejected that a situational network must be formed within a social network and not seeing any independent justification for requiring any kind of "node," the Court also rejects this part of SitNet's construction. But given the complexity and length of Meta's proposed construction, the Court adopts its own. Neither party objected to this construction, aside from SitNet's requested limitations discussed above. Tr. 18:21–19:17.

## II.    A situation authority

The parties dispute the meaning of "a situation authority," which appears in claim 13 of the '345 patent, claim 2 of the '454 patent, and claims 6 and 22 of the '932 patent.

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| an entity operating a server with one or more event nodes providing information concerning a situation | an entity comprising a trusted provider that aggregates and provides comprehensive information related to the situation | an entity providing information concerning a situation |

The Court adopts its own construction. Meta proposes using "trusted provider," but that term itself isn't a model of clarity, so it doesn't do much to clarify "situation authority." And though Meta pulls "trusted," "aggregates," and "comprehensive" from the specifications, the specifications' use of those words is not restrictive: the specifications say that situation authorities "include, but are not limited to" certain organizations and that situation authorities "generally are able to aggregate and provide comprehensive information." '345 Patent Spec. 4:19–21; *accord* '454 Patent Spec. 4:8–11; '932 Patent Spec. 3:61–64. Nor are trust, aggregation, and comprehensiveness key to the situation authority's function (and Meta conceded at the hearing that it wasn't wedded to any of these limitations, Tr. 21:11–22:2). The situation authority's role is to provide information. *See* '345 Patent Spec. 6:41–7:51. So the Court construes it as such.

The Court also rejects SitNet's limitations, adding a server and event nodes. SitNet relies on this specification line: "There is a corresponding situation authority server … also referred to as an event node server, for each situation authority." '345 Patent Spec. 4:27–29. But SitNet takes the line out of context. It is describing a figure illustrating just one embodiment. *See id.* at 4:16–32. Later, the specifications contrast (1) a "centralized architecture embodiment," in which "users … are connected using centralized connections … to a situation authority server," with (2) a "decentralized architecture," in which "the situation authority acts as a participant" but "does not act as the central authority or host, as would be found in the centralized architecture." *Id.* at 6:44–47, 6:61–7:9; *see also* '345 Patent Figs. 41–42. The possibility of a decentralized architecture confirms that an event-node server is not inherent to a situation authority.

4

## III.    A projection of a situational network

The parties dispute the meaning of "a projection of a situational network," which appears in claims 1, 10, and 20 of the '454 patent.

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| a subset of a personal information network, comprising member nodes, formed in response to an event or situation | a subset of a situational network | a subset of a situational network |

The Court adopts Meta's construction. Given the construction of "a situational network" above, the only thing that needs construction here is "projection." Both sides agree that "projection" means subset. And at the hearing, SitNet acknowledged that the construction of "a situational network" should be consistent. Tr. 32:17–23. So there is no real dispute here, and the Court simply construes "projection" to mean "subset."

## IV.    Event node

The parties dispute the meaning of "event node," which appears in claims 1, 10, and 20 of the '454 patent, and claim 7 of the '932 patent.

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| a node on a personal information network corresponding to an event or situation | a node on a situational network corresponding to an event or situation | Needs no construction |

The Court rejects both parties' constructions. As Meta rightly points out, SitNet's construction is awkward because "event node" is almost always followed by "in a multi-dimensional personal information network." *See, e.g.*, '454 Patent Cls. 1, 20. So SitNet's construction would read, "[A node on a personal information network] in a multi-dimensional personal information network." *Id.* (both). SitNet seems to think the redundancy presents no issue, but it also hasn't explained the reason for omitting "multi-dimensional" if it merely meant to take a belt-and-suspenders approach. *See* Dkt. 57 at 25–26.

Yet Meta's construction is awkward too. By its terms, "event node" doesn't tell the reader where it is. That's why the claims add "in a multi-dimensional personal information network." Meta's argument is that, from context, one understands that the "event nodes" in the claims "are simultaneously nodes on a situational network and on a personal information network." *Id.* at 26. But inferring the location or use of an "event node" is not the same as inferring its meaning. The latter is the purpose of claim construction.

Plus, Meta's reading is not obvious. For example, one claim teaches "creating … an event node in a multi-dimensional personal information network" and then "forming a projection of nodes of

5

the situational network using geographic locations of a plurality of devices corresponding to nodes in the multi-dimensional personal information network." '454 Patent Cl. 1. This language suggests that the nodes on the situational network might be different from those on the multi-dimensional personal information network. At the very least, the node's location isn't found in the modifier "event."

But "event" does make clear that the node corresponds to an event, so that part of each side's construction is unnecessary. In fact, the claims clarify that "the event node correspond[s] to a situation," *id.*, so both constructions would introduce the same kind of awkward redundancy as discussed above. As such, the Court declines to construe this term.

## V.    Roll call information

The parties dispute the meaning of "roll call information," which appears in claim 5 of the '345 patent.

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| Not indefinite; "the roll call list" | Indefinite | Not indefinite; "the status responses and the roll call list" |

The Court holds that "roll call information" is not indefinite but rejects SitNet's construction. Meta argues that the term is indefinite because it lacks an express or implied "antecedent basis." Dkt. 57 at 27. The Court disagrees. Although perhaps not the model of precision, the claims have "internal coherence" and "convey[] claim meaning with reasonable certainty." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). And "the record does not contain clear and convincing evidence that a person of ordinary skill in the art would fail to be reasonably certain … as to the scope of the claims." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1285 (Fed. Cir. 2023).

The only claim at issue here is claim 5 of the '345 patent. It depends from claim 1. Putting the two together clarifies the meaning of "roll call information":

1. A method of accessing situation related information, the method comprising:

receiving an indication of an occurrence of a situation;

forming a situational network related to the occurrence of the situation with a plurality of participant devices determined to be geographically proximate to the situation, each of the participant devices corresponding to a participant in the situational network;

presenting a roll call query to each of the plurality of participant devices soliciting a reply related to a status of the participant;

receiving a status response from one or more of the participants; and

6

> aggregating the status responses from responsive participants into a roll call list.
>
> …
>
> 5. The method of claim 1, further comprising:
>
> establishing an electronic message board for providing access to the roll call information related to the situation for individuals not participating in the situational network.

In context, "roll call information" reasonably refers to the information related to the "roll call query": the "status responses" and, once compiled, the "roll call list." This reading is confirmed by claims 13 and 16: claim 13 refers to a "central server for storing the [status] responses and the roll call list," and claim 16 (which depends from claim 13) refers to configuring "the central server … to establish an electronic message board for providing access to the roll call information." Although this term may be broad, it is not indefinite.

## VI.    Caus[e/ing] an automatic redirection of a web browser application operating on each of the devices

The parties dispute the meaning of "caus[e/ing] an automatic redirection of a web browser application on each of the devices," which appears in all of the '932 patent's asserted claims.

| SitNet's Construction | Meta's Construction | Court's Construction |
|---|---|---|
| Plain and ordinary meaning | [causing/cause] a redirection of a web browser application operating on each of the devices without user action | caus[e/ing] a redirection of a web browser application operating on each of the devices without the user's choosing to go to the redirected page at that time |

In the briefs, there seemed to be little daylight between the parties on this term. SitNet argued that "automatic" still permitted some user input at some steps. Meta agreed; it just wanted to clarify that the redirection itself must be automatic. SitNet didn't seem to have an issue with that. It said that "the plain and ordinary meaning of this term is that the browser application redirects the user to a page related to the situation *without the user instructing the browser application to go to that page*." Dkt. 57 at 40 (emphasis added). At the hearing, SitNet walked this argument back. It pointed to Figure 26, in which a user clicks a link, as an example of "automatic redirection." Tr. 50:25–51:12; '932 Patent Fig. 26. It said that the computer code operating in the background "automatically" redirects the browser after the user clicks the link.

This understanding of "automatically" is too weak. Of course, nothing is truly automatic—human invention or intervention is always somewhere along the chain. The question is what human function is being automated. *Cf. CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (describing a dishwasher, autopilot, and auto-populating forms as automatic "because

a machine still performs the claimed functions without manual operation, even though a human may initiate or interrupt the process"). In ordinary speech, not everything a computer does is "automatic." The Court wouldn't say that the word processor "automatically typed" or "automatically displayed" this sentence as the Court pressed the keys on the keyboard. There are certain computer functions (like running background code to navigate to a website) that are never done by humans, so it makes little sense to think of them as "automatic."

The '932 patent's specification reflects the same understanding. It describes how a "situational network may be used to broadcast emergency information to users connected through into [*sic*] the situational network." '932 Patent Spec. 24:49–51. "In one embodiment, a user's home page is automatically re-directed to a website where [the] most current information regarding the emergency can be found. Similarly, emergency information can be directed to users' cell phones and PDA's." *Id.* at 24:51–55. "In an alternate embodiment, the emergency information provider establishes an event node of the situational network. A user is invited to connect to the event node to receive updated information. Once the user accepts the invitation, new updates are automatically delivered[.]" *Id.* at 24:55–59. This description is the only time automatic redirection is mentioned. And it contrasts automatic redirection with accepting an invitation. In context, the patent seems to understand automatically redirecting the user's home page as akin to "interrupting your regularly scheduled programming" on TV. There may be any number of human actions leading up to the redirection (like having the device, using the network, opting in, and so on), but the redirection itself must not be the user's choice.

This understanding also has another thing going for it: only it "is consistent with … the problems the invention sought to redress." *CollegeNet*, 418 F.3d at 1235. The point of automatically redirecting the user is to rapidly display emergency information. "Automating" the process of going from one webpage to another has nothing to do with that purpose. Only automating the process of displaying the page does so.

Figure 26 doesn't suggest a different understanding. Nothing in the figure itself says anything about automatic redirection. Nor is automatic redirection mentioned when the figure is described in the specification. Instead, that part of the specification describes how a "user may be connected … using a link," "a user … may visit a webpage," and a "user … may click on a link … and be connected to a centralized social networking website." '932 Patent Spec. 31:14–27; *see also id.* at 2:42–44 ("FIG. 26 is an example of a method of connecting to a weather-dependent social network in accordance with the SitNet of FIG. 1[.]"). All these descriptions have the user as the active subject. There is no hint of automaticity. So the Court interprets the term to make clear that the redirection process must be automatic.

## VII.    Caus[e/ing] an automatic redirection of a web browser application on each of the devices to a webpage and provid[e/ing] … at least one of the plurality of advertisements … for display on the webpage

The parties dispute the meaning of "caus[e/ing] an automatic redirection of a web browser application on each of the devices to a webpage and provid[e/ing] … at least one of the plurality

of advertisements … for display on the webpage," which appears in all of the '932 patent's asserted claims. (In one claim, this language is preceded by "a central server … configured to," but the parties agree that phrase doesn't make any difference. *See* Dkt. 57 at 49.)

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| Plain and ordinary meaning | "caus[ing] an automatic redirection . . . to a webpage" must occur prior to "provid[ing] at least one of the plurality of advertisements [ . . . ] for display on the webpage" | "caus[ing] an automatic redirection . . . to a webpage" must occur prior to "provid[ing] at least one of the plurality of advertisements [ . . . ] for display on the webpage" |

Here, the parties supposedly disagree over whether the user must be redirected before seeing the ad. Yet "SitNet agrees as a practical matter that redirection occurs before the very first of the advertisements … is provided to the device being redirected." Dkt. 57 at 52. SitNet's concern is that the claims also capture "a subsequent redirection after an initial advertisement is provided." *Id.* at 53. At the hearing, Meta made clear that its construction would not exclude that possibility. Tr. 67:18–22. Instead, it is asking the Court to "enter an order confirming that the steps … must occur in the order in which the elements *are written.*" Dkt. 57 at 53.

"As a general rule, unless the steps of a method claim actually recite an order, the steps are not ordinarily construed to require one." *Mformation Techs., Inc. v. Rsch. In Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014) (cleaned up). "However, a claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Id.* (internal quotation marks omitted). (And though this inquiry doesn't involve construing a particular term, the Federal Circuit has treated it as a matter for claim construction. *See, e.g.*, *id.*; *Dionex Softron GmbH v. Agilent Techs., Inc.*, 56 F.4th 1353, 1359 (Fed. Cir. 2023); *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1028, *reh'g granted and opinion modified*, 776 F. App'x 707 (Fed. Cir. 2019).)

Here, logic and grammar require a particular order. The claims involve "causing an automatic redirection … to a webpage … and providing to each of the devices … advertisements … on the webpage." A device can't receive an ad "on *the* webpage" without first going there. *Cf. Mformation*, 764 F.3d at 1398–1400 ("As a matter of logic, a mailbox must be established before the contents of said mailbox can be transmitted."). SitNet hasn't given any reason to think the steps could be done in another order. So the Court adopts Meta's construction.

## VIII.    A web browser application

The parties dispute the meaning of "a web browser application," which appears in all of the '932 patent's asserted claims.

| SitNet's Construction | Meta's Construction | Court's Construction |
| --- | --- | --- |
| Plain and ordinary meaning | an application that enables users to browse World Wide Web pages across the Internet | an application that enables users to browse webpages |

Dawn broke at the hearing, and the parties realized that they had been ships passing in the night on this term. SitNet was concerned with only the internet–intranet distinction, and Meta was concerned with only including the ability to browse across pages. Tr. 69:6–72:14. Neither one objected to the Court's proposed interpretation, incorporating both elements. *Id.* at 72:16–73:17.

## IX.    Undisputed terms

The parties have agreed to two constructions, and the Court adopts both. First, they construe "a multi-dimensional personal information network" in '454 patent claims 1 and 10 to mean "a network that captures and manages multi-dimensional relationships between users of the network." Dkt. 57 at 6. Second, Meta claimed that the word "profile" as used in '932 patent claim 5 was indefinite. SitNet responded that claim 5 has a typo and should depend from claim 4 (rather than claim 1) of the '932 patent. Meta agreed to the change, resolving the dispute. *Cf. Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (noting that courts can correct typos in patents).

**CONCLUSION**

For these reasons and those stated on the record at the July 1 hearing, the disputed claim terms are construed as set forth above.

The Clerk of Court is directed to close Dkts. 49, 50.

SO ORDERED.

Dated: July 16, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge